No. 123,017

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ALLIANCE WELL SERVICE, INC.,
AMIGOS WELL SERVICE, INC., and
REDLINE WELL SERVICE, LLC,
*Appellants*,

v.

PRATT COUNTY, KANSAS,
*Appellee*.

SYLLABUS BY THE COURT

The Kansas Department of Revenue's Property Valuation Division's Kansas Oil and Gas Appraisal Guide classification of mobile service rigs as subclass 2(2) oil and gas property does not violate the Equal Protection Clause under the Fourteenth Amendment to the United States Constitution.

Appeal from Pratt District Court; FRANCIS E. MEISENHEIMER, judge. Opinion filed January 21, 2022. Affirmed.

*John D. Beverlin II*, of Stull, Beverlin, Nicolay & Haas, LLC, of Pratt, for appellants.

*Trevor C. Wohlford*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Topeka, for appellee.

*Shelley Woodard*, of Legal Services Bureau, for amicus curiae Kansas Department of Revenue.

Before GREEN, P.J., CLINE, J., and JAMES L. BURGESS, S.J.

CLINE, J.:  Three oil and gas well servicers (Well Servicers) challenge Pratt County's classification of their mobile well service rigs as oil and gas property in tax years 2015 and 2016. They claim the rigs should be tax exempt under the "commercial and industrial machinery and equipment" (CIME) exception provided for in K.S.A. 79-223. They also argue the property valuation guidelines in the Kansas Oil and Gas Appraisal Guide (Guide) violate Kansas statutes and create an arbitrary and discriminatory tax classification that violates their right to equal protection under the law.

We find Pratt County properly taxed the rigs. Wells service rigs have been classified as oil and gas property since Kansas' property tax classification scheme was established by constitutional amendment and implemented in 1989. L. 1985, ch. 364, § 1 (effective January 1, 1989). Before the enactment of Article 11, section 1, such rigs were taxed as mineral leasehold property since at least 1965. The rigs are not CIME exception property, and the Guide does not violate Kansas statutes or the Constitution. Well Servicers have come to the wrong branch of government to seek redress. We affirm the district court's well-reasoned opinion.

FACTS

Well Servicers contract with oil and gas operators to provide services in connection with oil and gas well operations throughout Kansas. They are licensed and regulated by the Kansas Corporation Commission (KCC). Their principal place of business is Pratt County, Kansas. Collectively, Well Servicers possess 14 mobile well service rigs, also known as workover rigs. These rigs are used to perform services in Kansas oil and gas fields. The rigs are driven from location to location as needed to perform two types of services:  (1) services through the wellbore mainly to influence the underground reservoir or formation and (2) services on the wellbore and related equipment. Well Servicers acquired 12 of the 14 rigs through bona fide transactions after June 30, 2006.

2

The first type of services—services through the wellbore mainly to influence the underground reservoir or formation—may be performed either during completion or recompletion of a well. Completion is preparing a well for commercial production with a wellhead and downhole tubing. Recompletion is reentering a well and redoing or repairing the original completion to restore or enhance the well's productivity.

During well completion, Well Servicers run tubing inside the cased wellbore and, if needed, they may run rods and insert pumping apparatuses. Well Servicers also pull and set tubing and equipment for production from new formations and plug or seal off depleted formations.

The second type of services—services on the wellbore and related equipment—consist of machine repairs, cleaning, and well stimulation. When performing such work, Well Servicers typically shut down production from the wells they are servicing and sometimes shut down production from the lease entirely.

Well Servicers also perform diagnostic oilfield well tests, well plugging services, and services in connection with observation wells, injection wells, and other wells that do not produce minerals. In the past, Well Servicers provided services in connection with drinking water wells, but such services did not occur during the tax years at issue.

Well Servicers' mobile service rigs are similar in use and character to rigs that were once dedicated to a single well location. Mobile service rigs became the industry standard in the 1950s. But some oil and gas companies still operate their own well service rigs and perform their own well service work rather than outsource the work to contractors (like Well Servicers).

Beyond Well Servicers' services and equipment, other contractors and equipment, such as seismic equipment, drilling rigs, backhoes, diagnostic equipment, downhole

3

tools, and fishing tools, may be used to perform work during the various phases of an oil and gas project.

*Property Tax Classification in Kansas Generally*

Article 11, section 1 of the Kansas Constitution creates two general classes of property for tax assessment purposes. Class 1 consists of real property and Class 2 consists of tangible personal property. Kan. Const. art. 11, § 1. Class 2 property—tangible personal property—is divided into six subclasses with corresponding assessment rates:

| Subclass | Description | Assessment Rate (percentage of value) |
|---|---|---|
| (1) | Mobile homes used for residential purposes. | 11.5% |
| (2) | Mineral leasehold interests except oil leasehold interests the average daily production from which is five barrels or less, and natural gas leasehold interests the average daily production from which is 100 mcf or less, which shall be assessed at 25%. | 30% |
| (3) | Public utility tangible personal property including inventories thereof, except railroad personal property including inventories thereof, which shall be assessed at the average rate all other commercial and industrial property is assessed. | 33% |
| (4) | All categories of motor vehicles not defined and specifically valued and taxed pursuant to law enacted prior to January 1, 1985. | 30% |

| | | |
|---|---|---|
| (5) | Commercial and industrial machinery and equipment which, if its economic life is seven years or more, shall be valued at its retail cost when new less seven-year straight-line depreciation, or which, if its economic life is less than seven years, shall be valued at its retail cost when new less straight-line depreciation over its economic life, except that, the value so obtained for such property, notwithstanding its economic life and as long as such property is being used, shall not be less than 20% of the retail cost when new of such property. | 25% |
| (6) | All other tangible personal property not otherwise specifically classified. | 30% |

Kan. Const. art. 11, § 1.

*Property Tax Classification of Oil and Gas Property*

K.S.A. 79-329 authorized the classification of Kansas oil and gas property as tangible personal property. The statute provides:

> "For the purpose of valuation and taxation, all oil and gas leases and all oil and gas wells, producing or capable of producing oil or gas in paying quantities, together with all casing, tubing or other material therein, and all other equipment and material used in operating the oil or gas wells are hereby declared to be personal property and shall be assessed and taxed as such." K.S.A. 79-329.

Kansas law "requires oil and gas properties to be appraised uniformly and equally at fair market value. Toward that end, the law mandates county appraisers adhere to the

Kansas Oil and Gas Appraisal Guide developed by the Kansas Department of Revenue's Property Valuation Division unless just cause is shown for deviation." *In re Tax Appeal of River Rock Energy Company*, 313 Kan. 936, 937-38, 492 P.3d 1157 (2021).

The Kansas Department of Revenue's Property Valuation Division (PVD), with advice and input from industry representatives and county appraisers, develops the Kansas Oil and Gas Appraisal Guide (the Guide) each year to help county appraisers value oil and gas properties for purposes of ad valorem property taxation. K.S.A. 79-5105a. The Guide does not list all equipment that may be used in connection with oil and gas well operations. Rather, it includes only a partial list of prevalent items used.

The Guide categorizes well service rigs according to engine size and hook load. The rig classification categories range from the 100 Series rig for shallow wells to the 500 series rig for deep wells. All series of rigs do essentially the same work; it is the depth of the well, and sometimes the well location, that determines which rig series is appropriate for a particular well servicing assignment.

For the tax years at issue in this appeal, Well Servicers listed and reported (rendered) the service rigs as Series 200 and Series 300 rigs. The Guide specifically identifies Series 200 and Series 300 rigs as "'[i]temized [e]quipment.'" Itemized equipment is property located on the lease, in storage yards, or other sites which is not part of the producing "'prescribed'" equipment.

Well service rigs have been classified as subclass 2 of section 2 oil and gas property since Kansas' property tax classification scheme was established by constitutional amendment and implemented in 1989. L. 1985, ch. 364, § 1 (effective January 1, 1989). Before the enactment of Article 11, section 1, Kansas property tax authorities have taxed well service rigs as mineral leasehold property since at least 1965.

Certain mobile equipment, or portions of equipment, used in Kansas oil and gas operations is not classified and taxed as subclass 2(2) oil and gas property. For example, Series 100 rigs do not include a truck/carrier value because the rig equipment typically can be separated from the chassis cab. The rig equipment on a Series 100 rig is taxed as subclass 2(2) oil and gas property, and the chassis cab is taxed as subclass 2(4) motor vehicle property. On the other hand, the values assigned to Series 200, 300, 400, and 500 rigs include a carrier value because the rig equipment and chassis cab are built as a single operating machine issued exclusively for serving, cleaning out, or drilling oil wells. For another example, diagnostic wireline equipment, consisting of data logging tools lowered on a truck-mounted wire, is classified as subclass 2(5) CIME property.

As discussed, oil and gas equipment is treated as tangible personal property for tax assessment purposes, so oil and gas equipment is listed and reported (rendered) to the local county appraiser by the property owner. See K.S.A. 79-332a. Property owners render oil and gas property by filing a statement of assessment on standard rendition forms. See K.S.A. 79-332a. The county appraiser then reviews the owner's rendition, determines whether changes are required, and notifies the owner of the appraised value. See K.S.A. 79-1460.

Pratt County used the information rendered by Well Servicers and referenced the Guide to classify and value the rigs for the tax years in issue (2015 and 2016) and then assessed the property taxes due accordingly.

*The CIME Exemption*

In 2006, the Kansas Legislature exempted CIME from ad valorem property taxation "acquired by qualified purchase or lease made or entered into after June 30, 2006, as the result of a bona fide transaction not consummated for the purpose of avoiding taxation." K.S.A. 79-223(b). The CIME exemption statute tracks Article 11,

7

section 1 of the Kansas Constitution and defines CIME as subclass 2(5) property. K.S.A. 79-223(c).

During committee hearings on the CIME exemption, the Secretary of the Kansas Department of Revenue provided lawmakers with revenue data to forecast the statewide fiscal impact of exempting subclass 2(5) CIME. Minutes, House Comm. on Taxation, February 17, 2006 (H.B. 2619), p. 25-40. The Secretary also provided information to help lawmakers define the scope of the CIME exemption, explaining that "[q]ualifying equipment is that which would currently be valued at retail cost less depreciation (classified in subclass 5 of class 2 section 1 article 11)." Minutes, House Comm. on Taxation, February 17, 2006 (H.B. 2619), p. 33. In her written testimony, the Secretary noted the exemption would not apply to tangible personal property historically valued at market value, and specifically identified "[o]il and gas leases including the prescribed personal property" and "[o]il and gas itemized personal property such as drilling equipment and rigs, pipe, casing" as equipment that would not qualify as exempt subclass 2(5) CIME. Minutes, House Comm. on Taxation, February 17, 2006 (H.B. 2619), p. 33.

*Failed Legislative Initiative to Reclassify Well Service Rigs as CIME*

In 2016, Well Servicers took part in a legislative initiative to amend the Kansas tax code to reclassify well service rigs and other mobile equipment and materials used temporarily at oil and gas well sites as CIME, and thus exempt under subclass 2(5) personal property. The measure, introduced as House Bill 2264, would have amended K.S.A. 79-329 as follows:

"For the purpose of valuation and taxation, <u>certain oil and gas property, certain equipment and material used in operating oil and gas wells and certain equipment and material temporarily used at an oil or gas well site,</u> shall be treated as follows:
"<u>(a)</u> All oil and gas leases and all oil and gas wells, producing or capable of producing oil or gas in paying quantities, together with all casing, tubing or other material

8

therein, and all other equipment and material used in operating the oil or gas wells are hereby declared to be personal property and shall be assessed and taxed as ~~such~~ the mineral leasehold estate pursuant to subclass 2 of class 2 of subsection (a) of section 1 of article 11 of the constitution of the state of Kansas.

      "(b) Equipment and material used at an oil or gas well site: (1) On a temporary basis; (2) not attached to the real property; and (3) used in drilling, servicing, testing, acidizing or fracking, casing installation, pulling or resetting, cementing or setting, fishing, packing, jetting, perforating or logging the oil or gas well shall not be considered equipment and material used in operating the oil or gas well pursuant to subsection (a), and are hereby declared to be personal property and shall be assessed and taxed as commercial machinery and equipment pursuant to subclass 5 of class 2 of subsection (a) of section 1 of article 11 of the constitution of the state of Kansas." (Additions underlined; deletions struck through.)

Ultimately, the Legislature did not enact House Bill 2264 into law.

*Well Servicers' Tax Dispute and BOTA Order*

Well Servicers paid their 2015 and 2016 taxes under protest and challenged the Pratt County Appraiser's classification of their tangible personal property—the mobile well service rigs. Well Servicers then brought their protest before the Board of Tax Appeals (BOTA). See K.S.A. 79-2005(f), (g).

Well Servicers argued to BOTA that the service rigs should be exempt from taxation as CIME, under K.S.A. 79-223. Additionally, Well Servicers argued classification of the rigs was arbitrary and does not meet the "uniform and equal" taxation requirement of Article 11, section 1 of the Kansas Constitution because the machinery of other oil well servicers is exempt from taxation under K.S.A. 79-223(b).

As for the first issue, BOTA unanimously found the Pratt County Appraiser correctly followed the PVD Guide when assessing the service rigs. BOTA then

concluded the service rigs did not qualify as CIME property. Thus, BOTA concluded that Pratt County had properly classified Well Servicers' rigs as subclass 2(2) oil and gas property rather than subclass 2(5) CIME property. BOTA declined to address the constitutionality of the classification, noting it has no authority to render such decisions. See *Kaufman v. Kansas Dept. of SRS*, 248 Kan. 951, 954, 811 P.2d 876 (1991) ("Administrative boards and agencies may not rule on constitutional questions; therefore, the issue of the constitutionality of a state statute or an administrative regulation must be raised when the case is appealed to a court of law."). BOTA concluded "that the Taxpayer's request is either a matter for the legislature to re-consider or for a court of competent jurisdiction's deliberations."

Ultimately, BOTA denied Well Servicers' protests "[d]espite the Taxpayers' compelling arguments of seeming inequity."

*Pratt County District Court Decision*

Well Servicers petitioned the Pratt County District Court for judicial review of BOTA's decision. After a hearing, the district court affirmed BOTA's decision.

As for Well Servicers' first argument—that the rigs should be classified as CIME property and not oil and gas property—the district court determined the service rigs were properly classified as subclass 2(2) property.

In so finding, the district court relied on both legislative history and on how service rigs have been historically categorized. See, e.g., *In re Tax Appeal of Wedge Log-Tech*, 48 Kan. App. 2d 804, 300 P.3d 1105 (2013). First, the court noted the Legislature appears to have specifically intended to exclude oil and gas properties from the CIME exemption in K.S.A. 79-223. Second, the district court pointed out that "since at least 1965, the workover rigs have been historically taxed as part of the oil and gas leasehold.

10

They have been valued and taxed as subclass [2](2) properties since the constitutional amendment implemented in 1989." The district court also noted that, while not indicative of the legislative intent when the CIME exemption was passed, in 2016 the Legislature declined the opportunity to amend K.S.A. 79-223 to include oil and gas property, including the service rigs at issue, as CIME property.

The district court held that BOTA properly determined the service rigs were subclass 2(2) property, and thus properly denied a K.S.A. 79-223 exemption to the property.

As for Well Servicers' constitutional argument, the district court held that neither the guidelines of the PVD Guide, nor the application of these guidelines by the Pratt County Appraiser in classifying Well Servicers' property, violated Well Servicers' right to equal protection:

> "The Court cannot find it unreasonable that similar equipment may be valued differently based upon its January 1 usage, when those distinctions are based on legitimate factors such as, whether it is idle or not, the type of well that it may be used on (oil or gas), and distinctions between different wells (depth or rate of decline) on which the equipment may be used. That is not a distinction based on class of ownership.
> "The legislature has determined classification distinctions should exist on equipment that is generally used in the oil and gas field. (i.e. drilling rigs, etc., v. wireline equipment and seismic equipment, etc.). Those distinctions reflect the fact the properties are different types of equipment. Those distinctions were explained and upheld based upon factual determinations and historical classifications in the [*In re Tax Appeal of*] *Wedge Log-Tech* decision. Those distinctions have a rational basis and they do not deny Equal Protection."

ANALYSIS

Well Servicers reprise their arguments on appeal. We find them no more persuasive than the Pratt County District Court did.

*Classification of the Service Rigs as Subclass 2(2) Oil and Gas Property*

Well Servicers first argue the service rigs should be classified as subclass 2(5) CIME property because they claim the service rigs are not used in operating the mineral leasehold interest of oil and gas wells. They assert the service rigs should not be in subclass 2(2) oil and gas property as they "have no logical connection to mineral leaseholds."

A. *Standard of Review*

"Whether certain property is exempt from ad valorem taxation is a question of law if the facts are not in dispute." *In re Tax Exemption Application of Mental Health Ass'n of the Heartland*, 289 Kan. 1209, 1211, 221 P.3d 580 (2009). Interpretation of a statute or administrative regulation is also a question of law over which appellate courts have unlimited review. *In re Tax Appeal of LaFarge Midwest*, 293 Kan. 1039, 1043, 271 P.3d 732 (2012). The burden of establishing the invalidity of an agency action rests with the party asserting invalidity, here, Well Servicers. K.S.A. 77-621(a)(1).

B. *Burden of Proof and the Presumption of Taxation*

In Kansas, all property—real and personal—is subject to taxation, unless expressly exempt. K.S.A. 79-101. For that reason, to successfully claim an exemption from taxation, the claimant must show the State has clearly relinquished its power to tax the subject property. *In re Application of Riverton Water Co. for Tax Exemption*, 23 Kan. App. 2d 496, 497, 932 P.2d 452 (1997).

While "[s]tatutes imposing a tax must be interpreted strictly in favor of the taxpayer," the burden of proving an exemption is high. *In re Tax Exemption Application of Mental Health Ass'n of the Heartland*, 289 Kan. at 1211. A party claiming an exemption to taxation must establish its right to such an exemption beyond a reasonable doubt, the highest burden of proof. *National Council v. Shawnee County*, 63 Kan. 799, 803, 66 P. 1011 (1901) ("It is a rule universally recognized that laws exempting property from taxation are to be strictly construed, and that the claimant of such exemption must establish, beyond a reasonable doubt, his right thereto."); see *In re B.D.-Y.*, 286 Kan. 686, 691, 187 P.3d 594 (2008) (discussing hierarchy of burdens of proof).

"[T]ax exemption statutes are interpreted strictly in favor of imposing the tax and against allowing an exemption for one that does not clearly qualify." *In re Tax Exemption Application of Mental Health Ass'n of the Heartland*, 289 Kan. at 1211. "All doubts concerning exemption are to be resolved against the exemption and in favor of taxation." *In re Tax Appeal of Scholastic Book Clubs, Inc.*, 260 Kan. 528, 532, 920 P.2d 947 (1996). Yet, "[s]trict construction of an exemption provision does not, however, warrant unreasonable construction." *In re Tax Exemption Application of Mental Health Ass'n of the Heartland*, 289 Kan. at 1211.

Well Servicers tacitly argue these maxims should not apply because they are not arguing an exemption applies to them per se. Rather, they assert that whether an exemption applies is irrelevant; they claim the only consideration before us is whether the service rigs should be classified as subclass 2(2) or 2(5) property. ("It is Appellants' position that consideration should be given to whether the Subject Properties are properly classified as Subclass 2[2] or whether they should be classified as Subclass 2[5] and not necessary whether the Subject Properties are exempt from property taxation under K.S.A. 79-223.").

Yet by framing the argument this way, Well Servicers essentially ask us to ignore the facts and the practical implications of our ruling. This matter originates from Well Servicers' payment of their 2015 and 2016 taxes under protest, arguing that the service rigs should be exempt from taxation as CIME property. See K.S.A. 79-223. Should we find that Well Servicers' rigs ought to be classified as subclass 2(5) CIME property, then 12 of the 14 service rigs would then become eligible for the statutory CIME exemption. See K.S.A. 79-223. Moreover, not only would most of Well Servicers' rigs fall into the CIME exception, but our ruling would, in effect, reclassify countless properties across Kansas from subclass 2(2) oil and gas property to 2(5) tax-exempt CIME property. See K.S.A. 79-223.

The potential for such a monumental shift in Kansas' taxation base is precisely why the well-accepted legal maxims mentioned above exist. The power of the Legislature to express what property must be taxed implies the power to prescribe what property will be exempt. *Director of Taxation v. Kansas Krude Oil Reclaiming Co.*, 236 Kan. 450, 454, 691 P.2d 1303 (1984). The relinquishment of such a power is never assumed. *State, ex rel. v. Shawnee County Comm'rs*, 132 Kan. 233, 237, 294 P. 915 (1931) (quoting Chief Justice Marshall in *Providence Bank v. Billings and Pittman*, 29 U.S. 514, 561, [4 Peters 514,] 7 L. Ed. 939 [1830]).

Further, when discussing the meaning behind the strict construction of tax exemptions, our Supreme Court has observed that, since taxes are the "'sole means by which sovereignties can maintain their existence, any claim on the part of anyone to be exempt from the full payment of his share of taxes on any portion of his property must on that account be clearly defined and founded upon plain language.'" *Shawnee County Comm'rs*, 132 Kan. at 237. Well Servicers offer no valid reason why we should treat them differently than any other taxpayer.

14

C. *Interpretation of K.S.A. 79-223 and Article 11, Section 1 of the Kansas Constitution*

As discussed above, K.S.A. 79-223(b) exempts certain items of commercial and industrial machinery and equipment acquired after June 30, 2006. The statute defines "commercial and industrial machinery and equipment" as "property classified for property tax purposes within subclass (5) of class 2 of section 1 of article 11 of the constitution of the state of Kansas." K.S.A. 79-223(d)(2). The CIME definition excludes "any electric generation facility or addition to an electric generation facility that is used predominately to produce and generate electricity utilizing renewable energy resources or technologies." K.S.A. 79-223(d)(2). K.S.A. 79-223(b) reads in part:

"(b) The following described property, to the extent specified by this section, shall be and is hereby exempt from all property or ad valorem taxes levied under the laws of the state of Kansas:

"*First*. Commercial and industrial machinery and equipment acquired by qualified purchase or lease made or entered into after June 30, 2006, as the result of a bona fide transaction not consummated for the purpose of avoiding taxation."

K.S.A. 79-223(d)(2) reads:

"(2) '[C]ommercial and industrial machinery and equipment' means property classified for property tax purposes within subclass (5) of class 2 of section 1 of article 11 of the constitution of the state of Kansas, but shall not include any electric generation facility or addition to an electric generation facility that is used predominately to produce and generate electricity utilizing renewable energy resources or technologies as defined in K.S.A. 79-201, and amendments thereto."

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be determined. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). An appellate court must first attempt to

15

ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019). With no ambiguity, we need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous do we use canons of construction or legislative history to construe the Legislature's intent. 309 Kan. at 150.

First, K.S.A. 79-223 is ambiguous because it provides no real guidance on what machines and equipment are removed from county tax rolls and what machines and equipment remain part of the tax base other than to reference Article 11, section 1. Even more, the terms "machines" and "equipment" are broad and can perform nearly unlimited functions throughout all sectors of the economy. See Black's Law Dictionary 678, 1138 (11th ed. 2019) (defining "equipment" as "[t]he articles or implements used for a specific purpose or activity [esp. a business operation]" and defining "machine" as "[a] device or apparatus consisting of fixed and moving parts that work together to perform some function").

Because the statute invokes Article 11, section 1 of the Kansas Constitution in its definition of CIME, we must also interpret that section of the Constitution. When interpreting constitutional provisions, an appellate court has a duty to look to the intention of the makers and adopters of the provision to achieve consistency so that the amendment "'shall not be taken to mean one thing at one time and another thing at another time.'" *State ex rel. Stephan v. Finney*, 254 Kan. 632, 643, 867 P.2d 1034 (1994); see *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 563, 186 P.3d 183 (2008). This holistic approach requires us to examine "'language used and consider it in connection with the general surrounding facts and circumstances that cause the amendment to be submitted.'" *In re Tax Exemption Application of Central Illinois Public Services Co.*, 276 Kan. 612, 621, 78 P.3d 419 (2003). The meaning of the constitutional provision must be "'gathered from both the *letter and spirit* of the document.'" *Hunt v. Eddy*, 150 Kan. 1, 5, 90 P.2d 747 (1939).

As stated above, Article 11, section 1(a) subsection 5 provides a 25% taxation rate for and calculation of taxes as:

> "Commercial and industrial machinery and equipment which, if its economic life is seven years or more, shall be valued at its retail cost when new less seven-year straight-line depreciation, or which, if its economic life is less than seven years, shall be valued at its retail cost when new less straight-line depreciation over its economic life, except that, the value so obtained for such property, notwithstanding its economic life and as long as such property is being used, shall not be less than 20% of the retail cost when new of such property." Kan. Const. art. 11, § 1(a), 5.

This subclass is one of six defined by the Legislature, mentioned earlier.

Looking to the plain language of this constitutional provision, the language in Article 11 is undoubtedly broad. For example, looking to the subclass in question, commercial and industrial machinery and equipment is so broadly drawn that it might embrace tangible personal property that falls within subclasses (2), (3), and (4).

As a result, we must interpret this constitutional provision in keeping with the surrounding facts and circumstances that led to the provision's enactment and consider the legislative circumstances surrounding that enactment. See *Hunt*, 150 Kan. at 5 ("In determining their true intent courts are not restricted and limited by a mere technical *interpretation* of the exact words employed, but are required to place upon the constitutional provision involved a *construction* which will take into account the attendant circumstances, such as the mischief sought to be remedied, if such considerations will assist them in arriving at the real intent of the framers and adopters.").

Article 11, section 1 of the Kansas Constitution was amended in 1986 as a prelude to statewide reappraisal, and that amendment established the property tax classification framework that exists today. See Kan. Const. art. 11, § 1. Prior to that, since 1963, all real

17

and tangible property was taxed at 30%. See L. 1982, ch. 391, § 33 (tangible personal property and real property must be assessed at 30% of fair market value). When the Legislature was preparing this amendment, it considered the testimony of interested citizens and organizations and the findings and recommendations of the Kansas Tax Review Commission. Note, *Kansas Property Classification and Reappraisal: The 1986 Constitutional Amendment and Statutory Modifications*, 29 Washburn L.J. 26, 34-35 (1989). The amendment became effective January 1, 1989. See *In re Appeal of Director of Property Valuation*, 284 Kan. 592, 596, 161 P.3d 755 (2007); 29 Washburn L.J. at 43. The commission concluded that additional changes in the law were necessary because property was not being taxed uniformly in the state. 29 Washburn L.J. at 35-36. Another panel of this court has examined the circumstances that prompted the 1986 taxation amendment. See *In re Tax Appeal of Wedge Log-Tech*, 48 Kan. App. 2d at 810-11. Crediting the Court of Tax Appeals' (COTA) (now BOTA) analysis, the panel quoted:

> "'This language was adopted by amendment in 1986, creating the property classification scheme that exists to this day. Like most constitutional provisions, this section is expressed in broad terms. In particular, we note that subclass 2(5) is so broadly drawn as to conceivably embrace property within any of the other tangible personal property subclasses. In view of this contextual ambiguity, our interpretation must not be narrow or technical but should be based on the facts and circumstances giving rise to the provision's enactment. [Citation omitted.]
>
> 'Leading up to the 1986 constitutional amendment, the Kansas Tax Review Commission was formed to advise the legislature on exigent property tax issues. This commission concluded that statewide reappraisal was appropriate because property was not being taxed uniformly and equally throughout the state. *See* Kansas Tax Review Commission, *Final Report and Recommendations*, P-5 (1985). In its report, the commission concluded that additional changes in the law were necessary to mitigate shifts in tax burden among the various classes of property that would inevitably result from reappraisal. *See id.* at P-6. The commission recommended "a comprehensive, straightforward classification system." *See id*. at P-9. The legislative history indicates no intention to redefine the substantive criteria for property classification. In fact, the

18

commission's final report suggests the opposite—that the amendment's purpose was to mitigate the anticipated disproportionate effects of reappraisal on existing classes of property throughout the state.'" 48 Kan. App. 2d at 811.

With these considerations in mind, we now move to the classification of mobile service rigs by the PVD as oil and gas property.

D. *The PVD's Classification of Mobile Service Rigs as Oil and Gas Property*

The PVD has classified the type of property at issue as oil and gas properties since 1965. This classification seems to rely on K.S.A. 79-329. As discussed above, K.S.A. 79-329 authorized the classification of Kansas oil and gas property as tangible personal property. The statute, passed in 1917, provides:

"For the purpose of valuation and taxation, all oil and gas leases and all oil and gas wells, producing or capable of producing oil or gas in paying quantities, together with all casing, tubing or other material therein, and all other equipment and material used in operating the oil or gas wells are hereby declared to be personal property and shall be assessed and taxed as such." K.S.A. 79-329.

Well Servicers do not believe the Kansas Legislature intended their service rigs to be taxed as subclass 2(2) personal property "together with" oil and gas leases and oil and gas wells. Additionally, Well Servicers do not believe the Kansas Legislature intended the rigs to be taxed as subclass 2(2) personal property because they claim the rigs are not used in "operating" oil and gas wells.

1. *Interpretation of "Together With"*

Well Servicers point to *In Tax Appeal of Barker*, 54 Kan. App. 2d 364, 398 P.3d 870 (2017), in support of their position that equipment used for oil and gas need not be classified the same as oil and gas property. In that case, the Barkers were seeking to

19

exempt equipment used in production of minerals from low production wells under a tax exemption in K.S.A. 79-201t(a). The *Barker* panel held that the phrase "together with" in K.S.A. 79-329 did not mean "including":

> "Our tax statute provides that an oil lease 'together with . . . tubing . . . and all other equipment' used to operate wells is personal property for purposes of taxation and does not compel the conclusion that equipment is part of an oil lease for purposes of the relevant tax exemption. We cannot reasonably read the phrase 'together with' to mean 'including.' The verbiage indicates that such equipment is what we used to call an 'appurtenance'—'[s]omething that belongs or is attached to something else.' Black's Law Dictionary 123 (10th ed. 2014)." 54 Kan. App. 2d at 373.

The *Barker* panel concluded that, for purposes of K.S.A. 79-201t, the term "oil lease" was intended to exempt the leasehold interest, not the leasehold interest together with the appurtenant well equipment. 54 Kan. App. 2d at 375. As the panel stated: "Equipment used to produce oil is not exempt from taxes pursuant to K.S.A. 2016 Supp. 79-201t(a), the statute exempting certain low production oil leases." 54 Kan. App. 2d at 365.

This holding undercuts Well Servicers' argument that the PVD lacks the power to classify these properties as subclass 2(2) oil and gas property. Instead, *Barker* reinforces the conclusion that all oil and gas property in Kansas is taxable, regardless of the profitability of the lease on which the equipment is used.

## 2. *Interpretation of "Operating"*

Well Servicers also argue that because they claim the rigs are not used to operate oil and gas wells they cannot be classified as subclass 2(2) property.

20

This argument is misplaced and conflates the terms "operate" and "produce." "Operate" means "to work," or "to bring about a desired or appropriate effect; have a certain influence." Webster's New World College Dictionary 1025 (5th ed. 2014). "Produce" means "to bring forth; bear; yield (a well that *produces* oil)." Webster's New World College Dictionary 1161 (5th ed. 2014).

Well Servicers stipulated that they are "in the business of providing services in connection with oil and gas well operations" and are licensed service rig contractors, which means they act as agents "in the operator's oil and gas operations." See K.S.A. 55-150(b); K.A.R. 82-3-101(a)(18). Yet they argue that the equipment they use to perform their services is not used in connection with oil and gas operations. To support this argument, Well Servicers stress that lease production typically stops when the service rigs are being used on a well site.

But the simple fact that a well operator typically temporarily halts production before it repairs or works over a wellbore does not mean it ceases well operations while those services are performed. If that were true, the operator would be in jeopardy of losing its lease rights. And it also does not mean that the equipment used while production is paused is not used in connection with oil and gas operations. Logically, an operator cannot sustain its operations without repairing and replacing well equipment, reworking wells to restore production, and recompleting wells to tap other pay zones. The service rigs are essential to well operations, so much so that prior to mobile well service rigs, these rigs were built dedicated for use at a single well location. Contracting operations out does not mean that those performing the work are not providing services that aid the operation of the oil and gas leasehold. Exemptions are granted based on the use of the property, not based on ownership alone. See *Topeka Cemetery Ass'n v. Schnellbacher*, 218 Kan. 39, Syl. ¶ 2, 542 P.2d 278 (1975).

21

K.S.A. 79-329, along with Article 11, section 1, contemplates that all oil and gas leases and wells and the equipment and materials used to operate those wells are to be included in the oil and gas property base. Support for this conclusion is supplied by looking at how the service rigs have been historically classified.

### 3. *Historical Classifications*

We can find more guidance in *In re Tax Appeal of Wedge Log-Tech*, 48 Kan. App. 2d 804. In that case, another panel of this court affirmed an order of COTA denying a request by the Ellis County Appraiser to reclassify truck-mounted diagnostic tools (known as "wireline equipment") as subclass 2(2) oil and gas property. 48 Kan. App. 2d at 805-06. "Wireline equipment includes logging tools that test porosity, resistivity, and permeability of rock in order to analyze the presence of certain rock formations that may indicate the presence of oil or gas." 48 Kan. App. 2d at 806. This property had historically been classified as subclass 2(5) CIME property and was so categorized across the State. 48 Kan. App. 2d at 813.

The *In re Tax Appeal of Wedge Log-Tech* panel rejected the county's attempt to refine the parameters of Kansas' tax classifications through ad hoc decision-making. The panel held that "'rulemaking, not adjudication, is the proper vehicle for implementing a shift in tax policy with such broad application and wide-ranging impact as that proposed here by Ellis County.'" 48 Kan. App. 2d at 816. The panel concluded that "it is the role of the legislature, not COTA or this court, to implement a shift in ad valorem tax policy in Kansas." 48 Kan. App. 2d at 816-17. In support of this holding, the panel relied on the following:  "If the County desires to change the historical classification of wireline equipment from schedule 5 property to schedule 2 property, the proper avenue is either promulgation of the change through the appropriate PVD guides or through statutory changes made by the legislature." 48 Kan. App. 2d at 817.

As in *In re Tax Appeal of Wedge Log-Tech*, Well Servicers are seeking to engineer a statewide shift in tax policy through litigation rather than legislation or rulemaking. The only distinction between *Wedge Log-Tech* and this case is that in *Wedge Log-Tech* the policy shift advocated by Ellis County would have presumably enlarged the tax base, while here the policy shift Well Servicers seek would presumably erode the tax base. As in *Wedge Log-Tech*, the service rigs have always been classified a particular way—as subclass 2(2) oil and gas property—and nowhere else in the State categorizes the disputed property in the manner advocated by Well Servicers. See 48 Kan. App. 2d at 809. Our courts have repeatedly emphasized the principle that broad shifts in the tax policy should be implemented through legislation and rules, not from the bench, regardless of whether the shift enlarges or erodes the tax base. See *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 348, 277 P.3d 1062 (2012) ("the legislature, unlike the judiciary, is one of the branches of government charged with development of public policy on behalf of the electorate"). We have no intention of departing from that well-reasoned principle.

The concerns of legislating by the judiciary are amplified here because, within the last five years, Well Servicers have already tried—unsuccessfully—before the Legislature to accomplish the reclassification they advocate for here. As discussed above, in 2016, Well Servicers participated in a legislative initiative that would have amended the Kansas tax code to reclassify property currently classified under subclass 2(2) oil and gas property, such as well service rigs and other mobile oil and gas equipment, as subclass 2(5) CIME property. The measure died in committee.

E. *The 2006 CIME Exemption and Classification of Mobile Oil Well Service Rigs*

Bringing all these pieces together, we find the service rigs were correctly classified as subclass 2(2) oil and gas property and are therefore not subject to the subclass 2(5) CIME exemption under K.S.A. 79-223.

Under K.S.A. 79-329, all oil and gas property, including equipment used in the production of oil and gas, is personal property subject to very few exemptions. See K.S.A. 79-201t(a) (exemption for oil lease on low-producing wells, but equipment not exempt); *In Tax Appeal of Barker*, 54 Kan. App. 2d at 365 ("[e]quipment used to produce oil is not exempt from taxes pursuant to K.S.A. 2016 Supp. 79-201t[a], the statute exempting certain low production oil leases").

Article 11, section 1 requires that tangible property be categorized into one of six subclasses of property. Subsection 2(2) provides the following be taxed at 30%: "Mineral leasehold interests except oil leasehold interests the average daily production from which is five barrels or less, and natural gas leasehold interests the average daily production from which is 100 mcf or less, which shall be assessed at 25%." Kansas law "requires oil and gas properties to be appraised uniformly and equally at fair market value. Toward that end, the law mandates county appraisers adhere to the [Guide] developed by the [PVD] unless just cause is shown for deviation." *In re River Rock Energy Company*, 313 Kan. at 937-38. Because the Legislature has defined oil and gas personal property to include equipment used in the production of it, it makes sense that this property would then be subcategorized under the most specific applicable subclass that the Kansas Constitution provides for, which is subclass 2(2). See *Merryfield v. Sullivan*, 301 Kan. 397, 398, 343 P.3d 515 (2015) ("It is a general rule of statutory interpretation that, when both a general statute and a specific statute govern the same topic, the specific statute controls."). Well Servicers' equipment is used in the operation of oil and gas leaseholds and is thus subclass 2(2) property. See K.S.A. 79-329.

The service rigs were properly classified by PVD as subclass 2(2) property. Because K.S.A. 79-223(b)'s exemption only applies to subclass 2(5) CIME property, this property was not exempt from taxation. BOTA and the district court were correct in upholding Pratt County's classification.

Second, the Legislature knows how to exempt specific subclasses of property, and its silence on this issue indicates there is no intent for oil and gas property to fall within the CIME exemption. For example, beyond K.S.A. 79-223, K.S.A. 79-224, which was enacted at the same time as K.S.A. 79-223's tax exemption, exempts certain telecommunications machinery and equipment as well as railroad machinery and equipment from taxation. Like K.S.A. 79-223, the definition of part of the exempted property in K.S.A. 79-224 tracks a specific subclass of property delineated in Article 11, section 1—there, subclass 2(3) property. K.S.A. 79-224(c)(4) ("'railroad machinery and equipment' means railroad machinery and equipment classified for property tax purposes within subclass [3] of class 2 of section 1 of article 11 of the constitution of the state of Kansas"). The rule of *expressio unius est exclusio alterius* instructs that the inclusion of one thing implies excluding another. *Cole v. Mayans*, 276 Kan. 866, 878, 80 P.3d 384 (2003). Here, in 2006 the Legislature expressly exempted subclass 2(3) and 2(5) railroad, telecommunications, and CIME property. And none of these subclasses include this property.

BOTA and the district court were correct in their analysis. Well Servicers' mobile well service rigs are subclass 2(2) property and are not subject to K.S.A. 79-223's CIME exemption.

*PVD's Use of the Guide Does Not Violate Well Servicers' Equal Protection Rights*

Well Servicers argue the PVD's use of the Guide violates their right to equal protection. Well Servicers make two arguments in support of their assertion that their right to equal protection is violated here. First, they argue classifying the mobile service rigs as part of an oil and gas leasehold violates their rights of equal protection because it fails to treat similarly situated taxpayers equally. Second, they argue the Guide violates their right of equal protection because it does not uniformly tax tangible personal

property it classifies as subclass 2(2) oil and gas property. Each argument is addressed in turn.

A. *Standard of Review and Legal Maxims*

The director of the PVD is tasked with devising or prescribing guides for the valuation of personal property, including the Guide at issue. See K.S.A. 75-5105a. County appraisers are mandated to follow the "policies, procedures and guidelines" established by the Guide. See K.S.A. 79-1456(a). As an administrative regulation, the Guide has the force and effect of law. See *In re Tax Appeal of City of Wichita*, 277 Kan. 487, 495, 86 P.3d 513 (2004). Challenges to the constitutionality of statutes are questions of law over which an appellate court has unlimited review. *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 250, 390 P.2d 1 (1996).

Tax classifications that do not involve a fundamental right or suspect classification are reviewed for a rational basis. *In re Tax Appeal of CIG Field Services Co.*, 279 Kan. 857, 878, 112 P.3d 138 (2005); see *State ex rel. Stephan v. Parrish*, 257 Kan. 294, 302, 891 P.2d 445 (1995) (applying rational basis review to Article 11, section 1 challenge). Under the rational basis standard, the party asserting the statute is unconstitutional has the burden to negate "'every conceivable basis which might support'" the classification. *Peden*, 261 Kan. at 253.

The Kansas Supreme Court has held that Article 11, section 1 of the Kansas Constitution provides virtually the same protection afforded by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *State ex rel. Tomasic v. City of Kansas City*, 237 Kan. 572, Syl. ¶ 13, 701 P.2d 1314 (1985). To establish an equal protection violation, the taxpayer must show that it has suffered disparate treatment from a deliberately adopted system which leads to intentional

26

systematic unequal treatment. *In re Tax Appeal of Weisgerber*, 285 Kan. 98, 104, 169 P.3d 321 (2007).

"'[I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification.'" *Peden*, 261 Kan. at 253 (quoting *Madden v. Commonwealth of Kentucky*, 309 U.S. 83, 88, 60 S. Ct. 406, 84 L. Ed. 590 [1940]). Legislatures have broad discretion in defining who is similarly situated for purposes of tax classification. See *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439-42, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). In fact, the United States Supreme Court has held that so long as a tax classification system is supported by a rational basis and is not "palpably arbitrary," even if it lacks "a precise, scientific uniformity," it will be upheld. *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 526-27, 79 S. Ct. 437, 3 L. Ed. 2d 480 (1959). The Kansas Supreme Court has held similarly. Under a rational basis test, a tax classification must only have a fair and substantial relation to the underlying purpose of the legislation. *Peden*, 261 Kan. at 258. Specifically, "[c]ourts are compelled under rational basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational basis review because it is not made with mathematical nicety or because in practice it results in some inequality." 261 Kan. 239, Syl. ¶ 9. Because of the great freedom of classification legislatures enjoy when devising tax schemes, courts must defer to the legislative branch as all tax schemes carry some form of discriminatory impact and weighing the relative discriminatory impacts of various proposals is mainly a legislative function, not a judicial function. 261 Kan. at 260.

Tax schemes are presumptively constitutional, and the burden rests with the provision's challenger to prove "'by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes.'" *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S. Ct. 1001, 35 L. Ed. 2d 351 (1973).

B. *The Guide's Treatment of Similarly Situated Taxpayers*

Well Servicers claim their equal protection rights have been violated because the Guide requires county appraisers to levy tax on some "non-productive mobile equipment" but allows other "non-productive mobile equipment" to escape taxation.

Tacit in Well Servicers' argument is the assumption that any equipment used in oil and gas operations not specifically listed in the Guide must be classified as subclass 2(5) CIME property. But they provide no legal or factual support for this assumption. Rather, the catch-all classification for tangible personal property is subclass 2(6), not 2(5). See Article 11, section 1 (defining subclass 2[6] as "[a]ll other tangible personal property not otherwise specifically classified"). And there is no disparity between subclass 2(2) and 2(6) property because both subclasses are assessed in the same manner and at the same taxation rate—30% of fair market value. See Article 11, section 1; K.S.A. 79-1439(b)(2)(B), (b)(2)(F).

Well Servicers point only to one nontheoretical comparison where there appears to be disparate treatment:  wireline equipment, which, as discussed, is classified as subclass 2(5) CIME property. See *In re Tax Appeal of Wedge Log-Tech*, 48 Kan. App. 2d at 814. It is Well Servicers' burden to show that this disparate treatment is void of *any* rational basis. Yet, the State, in its amicus brief, filed by the Kansas Department of Revenue, points us to a rational basis for the seemingly disparate treatment of wireline equipment and the Appellants' mobile well service rigs:  one is used in operations and the other is merely diagnostic. Workover rigs are used to complete, maintain, and stimulate the production of wells. Wireline equipment is diagnostic and not used in the production of oil and gas.

The State asserts the commonalities with wireline equipment that are not shared by permanently affixed drilling equipment does not mean that workover rigs and wireline

equipment are "arguably indistinguishable," and we agree. See *Weisgerber*, 285 Kan. at 106. As explained in *In re Tax Appeal of Wedge Log-Tech*, 48 Kan. App. 2d at 814, wireline equipment is purely diagnostic, consisting of data logging tools lowered from truck-mounted wires into wellbores to test the porosity, resistivity, and permeability of subsurface rock. In contrast, drilling rigs are different because they are "clearly used to extract oil and gas from the ground." 48 Kan. App. 2d at 814. The workover rigs at issue are functionally similar to drilling rigs—both types of rigs perform essential physical work that allows the operator to extract hydrocarbons from the ground. Drilling rigs establish the well's initial production and workover rigs restore or enhance the well's production. Williams & Meyers, Manual of Oil and Gas Terms 292, 1161-62 (2020) (defining "drilling rig" as "[t]he structures and equipment used in drilling an oil or gas well. This includes the derrick, the engine, the engine house, plus other equipment, the nature of which depends upon whether the rig is cable tool or rotary"; defining "workover rig" as "[a] piece of equipment designed to carry various tools necessary to engage in workover operations. A typical rig will contain equipment and tools such as a large crane to hoist the pipe and the block, slips to hold the pipe, [e]levators that attach to the pipe, tongs that make up and break it out, rod tools to pull and run rods, tubing handling tools such as backups and 36-inch pipe wrenches"; defining "work overs" as "[o]perations on a producing well to restore or increase production"); see 30 C.F.R. § 250.601 (defining "workover operations" as "the work conducted on wells after the initial completion for the purpose of maintaining or restoring the productivity of a well"). Given these similarities in rigs, the service rig owners are not similarly situated to wireline equipment owners. Well Servicers provides us with no other allegedly similarly situated comparator, so there can be no equal protection violation on these grounds. The disparate treatment is based in a rational basis.

C. *The Guide and Uniformity of Taxation*

Well Servicers argue the Guide "provides discounts to property based on the taxpayer's business practices or the temporary unprofitability of their business" and "allows previously classified Prescribed Equipment . . . to be removed and reclassified as Itemized Equipment but at a different value."

As discussed multiple times, Article 11, section 1 of the Kansas Constitution mandates that "the legislature shall provide a uniform and equal basis of valuation and rate of taxation of all property subject to taxation." Under this constitutional mandate, the Legislature enacted the statutes that govern oil and gas property tax appraisal in broad outline and delegated to PVD exclusive authority and discretion to develop appraisal policies, procedures, and directives to address the complexities of the field. See K.S.A. 75-5105a(b); *Board of Johnson County Comm'rs v. Duffy*, 259 Kan. 500, 507, 912 P.2d 716 (1996). The policy, procedures, and guidelines incorporated in the Guide carry the force and effect of law. See *In re Tax Appeal of City of Wichita*, 277 Kan. at 495. Properly promulgated rules and regulations, such as those in the Guide, are presumed valid. See *Hall v. Knoll Building Maintenance, Inc.*, 48 Kan. App. 2d 145, 150, 285 P.3d 383 (2012).

The parameters set forth in the Guide come from industry consensus, formulated annually in accordance with a rulemaking process designed to ensure participation from industry and government stakeholders. See K.S.A. 75-5105a(b). The Guide is a substantial document that consists of many schedules, tables, maps, definitions, and procedures formulated with the aim to produce uniform estimates of fair market value. See generally Kansas Oil and Gas Appraisal Guide.

In support of their argument that the Guide treats similarly situated property owners differently, Well Servicers point to the fact that two owners of the same

equipment are taxed differently based on the amount of use the equipment received. They provide this specific illustration:

> "A used series 200 derrick workover rig owned and currently used by Company A is taxed at a market value determined by PVD to be $52,500. The same used 200 series rig, currently unused by Company B for a period of between 6 months and a year, would be valued at $18,375. The Guide allows a taxpayer to apply a discount to the property depending on its use. Doing so grants Company B a temporary reprieve because of the company's unprofitability, whether as a result of the market conditions or as a result of bad business practices. The built-in discounts to the fair market value of the property have no relation to the functional, economic or social obsolescence [which] affect the value of the property. It also allows any taxpayer to inefficiently hoard and not use the oil and gas equipment."

Yet, this argument—that the perceived discount in tax based on the property's production violates the notion of fair market value—ignores the Legislature's declaration that when determining the fair market value of producing oil and gas leases for property tax purposes the "primary and predominant consideration" "is, has been and shall be the actual value of oil and gas production severed from the earth." K.S.A. 79-331(d)(1).

Again, "[t]he rational basis standard is a very lenient standard. All the court must do to uphold a legislative classification under the rational basis standard is perceive any state of facts which rationally justifies the classification." *Peden*, 261 Kan. at 258. One state of facts that rationally justify the classification and valuation here is that the Legislature has an interest in, and the right to determine that, taxing the actual production of a piece of equipment better serves the oil and gas industry rather than the mere existence of the equipment by imposing taxes tied to the likely increased or decreased output/income of a leasehold that are often out of control of the operator. Well Servicers have not negated every conceivable basis which might support the classification. See 261 Kan. at 253. There is no demonstrated equal protection violation.

31

The Kansas Department of Revenue's Property Valuation Division's Kansas Oil and Gas Appraisal Guide classification of mobile service rigs as subclass 2(2) oil and gas property does not violate the Equal Protection Clause under the Fourteenth Amendment to the United States Constitution.

We therefore affirm the conclusions of BOTA and the district court.

Affirmed.